IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| JAMIE SHAIN, | ) |
| | ) |
| Plaintiff, | ) Case no: |
| | ) |
| v. | ) |
| | ) |
| BNSF RAILWAY COMPANY, INC. | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT

Plaintiff Jamie Shain ("Shain" or "Plaintiff"), by his attorneys, Blunt Slocomb, LTD, for his causes of action against Defendant BNSF Railway Company, Inc. ("BNSF" or "Defendant") states and alleges as follows:

## NATURE OF ACTION

1.      This is an action by Plaintiff against Defendant to recover damages and other relief under the whistleblower provision of the Federal Rail Safety Act, 49 U.S.C. § 20109. Plaintiff alleges retaliation in the form of intimidation, threats, suspensions, termination, and other discriminatory and illegal acts. Further, this is an action to recover damages under the Federal Employers' Liability Act, 45 U.S.C. § 51 for injuries Mr. Shain suffered during the course of his employment with Defendants resulting from Defendants' negligence.

## PARTIES

2.      At all times material hereto, Plaintiff was a resident of Oklahoma employed by the Defendant.

3.      At all times material hereto, Defendant was engaged in interstate commerce as a common carrier by railroad, and all or part of plaintiff's duties as an employee of the defendant were in furtherance of interstate commerce and closely, directly and substantially affected the

same, by reason whereof the rights and liabilities of the parties were governed by the Act of Congress known as the Federal Employers' Liability Act, 45 U.S. Code, Sections 51-60.

## JURSIDICTION AND VENUE

4. This action seeks redress for the violation of the rights guaranteed to Plaintiff by the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20101 *et seq.*, and the Federal employers' Liability Act ("FELA"), 45 U.S.C. § 51 *et seq*.

5. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1337.

6. Pursuant to 28 U.S. C. § 1391(b) and 45 U.S. C. § 56, this action properly lies in the United States District Court of the Central District of Illinois because the events giving rise to Plaintiff's claims occurred within this District.

7. Plaintiff timely filed an administrative claim under 49 U.S.C. § 20109 with the Occupational Safety and health Administration's ("OSHA") Region 7 office bearing case No. 5-68-21-022.  More than 210 days have elapsed with no final decision, and Plaintiff therefore exercises his right to file an original action de novo pursuant to 49 U.S.C. § 20109(d)(3).

## FACTS

8. Shain is an experienced Foreman for BNSF who has supervised numerous tie gangs. He has supervised the replacement of hundred of thousands of railroad ties in a safe and efficient manner. He and a number of other experienced BNSF employees tended to work with one another on the same gangs over the course of their careers. As a group, they liked each other, got along and took pride in their jobs and their ability to replace ties safely and efficiently.

9. Haylee Lakenen is a BNSF employee that was first promoted to the position of Roadmaster in January, 2020. Roadmaster Lakenen's first assignment as Roadmaster was on a mini tie gang designated as TP-48. Shain was an Assistant Foreman on TP-48. During the annual

gang start up meetings, Roadmaster Lukanen made several comments that made it clear she did not appreciate the experience that Shain had with respect what it takes to run a safe, efficient and productive tie gang. Roadmaster Lakenen threatened employees that they had to run equipment they had not bid in. Also, Roadmaster Lukanen told the employees to begin work in the yard without protection (derails). Roadmaster Lakenen consistently expressed her opinion that daily tie replacement production was the #1 goal. She tried to make all the decisions and wouldn't let the gang do their job, said that this was her gang and treated the gang workers like they were stupid. On one occasion, Shain and the gang were talking about changing out the fire extinguishers from the old machines to the new machines and she interrupted the conversation and said that this was union business and that this did not have anything to do with briefing. Shain spoke to Roadmaster Lakenen's supervisor Ray Kite (ADMP) about her demeanor and behavior. ADMP Kite spoke to Roadmaster Lakenen about her demeanor and behavior. Shain bid off TP-48 shortly thereafter.

      10.     In January, 2020 Shain bid onto a Super Tie Gang "TP 05" as the Head Foreman. This gang was approximately three times larger than the TP-48 mini tie gang. A Super Tie Gang, such as TP-05, is created each year by BNSF upper management based upon the need to replace old and otherwise defective railroad ties over large swaths of BNSF' territory while at the same time minimizing disruption of freight revenue service. These Super Tie Gangs often travel from the southern U.S. in Texas in the early part of the year and eventually make their way up north in the summer and fall. Super Tie Gangs are designed, in terms of equipment and manpower, for maximum tie replacement production. The TP 05 gang was designed with 58 employees and 26 on track machines divided into three zones. Each zone had an Assistant Foreman who answered to Shain as the Head Foreman. There is often several miles separating the front of Zone 1 from

the back of Zone 3. TP-05 was expected to replace a minimum of 310 ties per "track window hour" of time given to work on the tracks.

11. After the production window closed, Shain was then responsible for preparing daily production reports and also logistically line up the work for the following day. Shain was also responsible for submitting the payroll work hours for the entire gang to the Roadmaster Lakenen for approval, including all overtime hours. Attendance on TP-05 during 2020 was a problem which in turn increased the stress on those gang members that remained to keep up with tie replacement production quotas.

12. Roadmaster Lakenen was reassigned in June 2020 to the TP-05 super tie gang and thus became Shain's direct supervisor. The gang was working in BNSF's Beardstown, Illinois subdivision. The TP-05 super tie gang was getting large amounts of track window hours of up to 10 to 11 hours per day. Roadmaster Lakanen had a number of discussions with Shain about increasing tie replacement production, and would point out that super tie gang TP04 had better tie replacement production and that they were the number 1 on the BNSF system in tie replacement production.

13. Roadmaster Lakenen pushed the gang to the limit during the hottest part of the day during the hottest part of the tie production season. When tie replacement activities occur during the hottest part of the day the rail tends to expand and bow out. This causes extra work for the gang. This happened on a number occasions in June 2020. Based upon past practice and extensive experience, Shain recommended to Roadmaster Lakenen on several occasions that the gang quit earlier in the day to avoid this unnecessary and more complicated and dangerous work. Roadmaster Lukanen refused this request and said "just because it is hot we don't stop

production." This occurred while COVID 19 was raging and BNSF employees such as Shain were deemed essential employees that were required to report to work.

14. Shain talked to Roadmaster Lakenen on several other occasions about unrealistic production goals and Shain was always just brushed off and told the same response, "if there's time available we are gonna install ties." At one point, the back of Zone three, which performs quality control, got 30 miles behind because of Roadmaster Lakenen's obsession with tie production goals.

15. Throughout the month of June, 2020 Roadmaster Lakenen was made aware of the fact that there was no water in the portable toilets for the employees to wash their hands. Shain, along with a number of other co-workers signed and submitted written statements demanding hygienic conditions. Roadmaster Lukanen would roll her eyes and refuse to address the issue. Numerous calls were made to the BNSF ethics and safety hotline about Roadmaster Lakenen's total disregard for the complaints of the workers.

16. On June 17, 2020 Roadmaster Lakenen called Shain's gang "pieces of shit" on channel 75 of the BNSF radio.

17. In July, 2020 several of the portable toilets were inoperable and there was no ice made available for the drinking water. Complaints were made to Roadmaster Lakenen. Roadmaster Lukanen advised Shain and the rest of the gang not to use the BNSF radio to complain about the lack of ice or portable toilets. Echoing Shain's complaints directly to Roadmaster Lukanen, a number of employees submitted a signed written statement complaining about Roadmaster Lukanen's failure to address the complaints about a lack of toilets, a lack of water for hand washing, and a lack of ice for drinking water while enduring high temperatures and high humidity.

18. Shain had both a subjective and objective basis to believe the working conditions created by Roadmaster Lakenen's mismanagement were safety hazards.

19. These unsafe working conditions complained of were conditions well within the control of BNSF and Roadmaster Lakenen.

20. BNSF purports to have a Heat Stress Prevention Program. That program, at least on paper, requires BNSF management to institute engineering controls to make the work environment safe for its employees to work in the heat and humidity. These requirements were flouted and disregarded by Roadmaster Lakenen even after Shain and others brought the safety issues to her attention.

21. BNSF also has hygiene program that requires safe and suitable restrooms and wash stations. This program, at least on paper, was in effect even before the COVID 19 Pandemic. These requirements were flouted and disregarded by Roadmaster Lakenen even after Shain and others brought the safety issues to her attention.

22. Shain's complaints to BNSF and Roadmaster Lakenen were protected activity as defined by the FRSA.

23. BNSF also allegedly instituted additional hygiene protocols because of COVID 19. These requirements were flouted and disregarded by Roadmaster Lakenen even after Shain and others brought the safety issues to her attention.

24. On July 14, 2020 Shain suffered an on-the-job injury near Altona, Illinois that ultimately required right shoulder surgery. While exiting his work vehicle Shain slipped and used his right hand to grab a hand hold which caused an injury to his right shoulder. Shain reported the on the job injury that same day. At the end of his shift, ADMP Ray Kite hand delivered a Notice of Disciplinary Investigation regarding track speed restrictions placed by Shain on July

10, 2020.On July 15, 2020 BNSF sent a letter to Shain notifying him of an additional Notice of Disciplinary Investigation for the purpose of ascertaining Shain's alleged dishonesty on June 17, June 22, and June 24 for being paid for overtime not worked and for not completing the duties he had been assigned on those days. The letter claimed that BNSF received first knowledge of this alleged violation on July 14, 2020.

25.     On July 29, 2020, the Formal Investigations on both matters were held. Roadmaster Lakenen was the primary witness for BNSF. On the speed restriction allegations, Shain proved the BNSF's position was without merit as Roadmaster Lakenen misinterpreted the BNSF rules pertaining to speed restrictions. On the second investigation pertaining to overtime and failure to perform duties, Shain proved that the investigation was procedurally deficient and untimely. Shain also proved that the allegations were without merit.

26.     On August 24, 2020 BNSF terminated Shain.

27.     BNSF retaliated against Shain for engaging in the protected activity alleged herein and because he reported an on the job injury when it terminated him on baseless charges brought forth by the very Roadmaster that was the individual creating the hazardous working conditions.

**FIRST CLAIM FOR RELIEF –
FRSA RETALITATION
49 U.S.C. § 20109(a) and (b)**

28.     Plaintiff repeats and incorporates by reference herein Paragraphs 1 through 27 as if fully set forth herein.

29.     The Federal Railroad Safety Act, in 49 U.S.C. § 20109(a)(1) and its implementing regulations at 29 CF.R. § 1982 et seq. state that a railroad engaged in interstate commerce may

not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee who provides information which the employee reasonably believes constitutes a violation of any Federal law, rule or regulation relating to railroad safety or security to a person with supervisory authority over the employee or such person who has the authority to investigate, discover or terminate the misconduct.

30. The Federal Railroad Safety Act, in 49 U.S.C. § 20109(b) and its implementing regulations at 29 CFR § 1982 et seq., state that a railroad engaged in interstate commerce shall not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee for reporting, in good faith, a hazardous safety or security condition.

31. BNSF knew that Shain engaged in the protected activities as defined in U.S.C. § 20109(a)(1) and § 20109.

32. BNSF retaliated against Shain and subjected him to adverse actions subsequent to and because he engaged in the protected activities defined in 49 U.S.C. § 20109(a)(1) and § 20109(b).

WHEREFORE, Plaintiff prays for relief as more fully set forth below:

    a) Reinstatement;

    b) Back pay with interest;

    c) Lost benefits with interest;

    d) Lost wages with interest;

    e) Compensatory damages for economic losses due to Defendant's conduct;

    f) Compensatory damages for mental anguish and emotional distress due to Defendant's conduct;

    g) Statutory maximum of punitive damages;

    h) Costs of Suit;

    i) Special damages for all litigation costs including expert witness fees and attorney fees;

    j) Award such other and further relief as this Court deems just and proper under the circumstances.

## SECOND CLAIM FOR RELIEF
### FELA, Negligence

33. Plaintiff incorporates the allegations of paragraphs 1 - 6 and 24 above as if fully set forth herein.

34. A the time of his injury, Shain was working as a part of BNSF's business as a railroad engaged in interstate commerce. Shain's duties directly and substantially affected interstate commerce.

35. On or about July 14, 2020, while performing his duties as a Foreman for BNSF, Shain was injured due to Defendant's negligence.

36. Defendant was negligent in at least the following ways:

    a. Failing to provide Shain a reasonably safe workplace.

    b. Failing to warn Shain of known or reasonably foreseeable dangers.

    c. Failing to provide Shain with adequate information concerning the areas in which he was required to work.

    d. Failing to keep its right of way free of debris and slip, trip and fall hazards.

37. As a direct and proximate result, in whole or in part, of the acts or omissions of Defendant, Plaintiff has been caused to undergo medical treatment for his right shoulder and the use, movement, and function of the aforementioned part of his body weas impaired.

Plaintiff has suffered, and because such injuries are permanent in nature, will forever in the future suffer pain, mental anguish, and disability. Plaintiff has been caused to lose earnings and his ability to work and labor in the future has been permanently diminished because of the injuries he suffered and the effect it has had upon him. In this regard, Plaintiff would show that he has suffered a decrease in his future wage-earning capacity. Plaintiff's ability to work, labor, and enjoy the ordinary pursuits of life has been or may be impaired and diminished. Plaintiff has been required to undergo medical care and treatment, and he will be required to undergo further care and treatment in the future. Plaintiff has expended or incurred reasonable expenses therefor and will be required to incur medical expenses in the future, the exact amount of which cannot be determined at this time. In the event Plaintiff did have any infirmities or pre-existing conditions in the aforementioned part of his body, said condition was aggravated, exacerbated, and caused to become symptomatic by the trauma sustained by plaintiff as described herein.

WHEREFORE, Plaintiff Jamie Shain prays that judgment be rendered in his favor and against this Defendant for an amount that is fair and reasonable and in excess of seventy-five thousand dollars ($75,000.00) for his costs herein expended, and for such further relief as the Court deems appropriate.

**JURY TRIAL DEMAND**

Plaintiff Shain hereby demands a trial by jury on all issues so triable.

DATED: October 25, 2021

Respectfully Submitted,

BLUNT SLOCOMB, LTD.

/s/ *Paul T. Slocomb*
Paul T. Slocomb #6226129
Blunt Slocomb, Ltd.
1115 Locust St., 4th Floor
St. Louis, MO 63101
314-231-5676
314-231-0323 (fax)